**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | | |
|---|---|---|
| CHRISTOPHER EUGENE COOK, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | 1:08CV300 |
| | ) | |
| MR. LEWIS SMITH, | ) | |
| | ) | |
| Respondent. | ) | |

### MEMORANDUM OPINION, ORDER, AND RECOMMENDATION
### OF UNITED STATES MAGISTRATE JUDGE

### I. Facts

Petitioner, a prisoner of the State of North Carolina, seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254. (Docket Entry 1.) On April 4, 1995, Petitioner pled guilty to second-degree murder and conspiracy to commit murder. The sentencing judge found as an aggravating factor that Petitioner committed the crimes for pecuniary gain and concluded that this aggravating factor outweighed any mitigating factors. Petitioner was then sentenced to life imprisonment. (Id. Ex. Q.) Under North Carolina's Fair Sentencing Act, which applied at that time, Petitioner's conviction constituted a Class C felony. (Id.)

According to the Petition, Petitioner's life sentence provided for parole-eligibility after ten years, making him eligible for parole on November 14, 2004. However, the North Carolina Post Release and Parole Commission (Parole Commission) denied parole because it determined that Petitioner's release at that time "would unduly depreciate the seriousness of [his] crime or promote disrespect for the law." (Id. Ex. A.) In 2005, North Carolina

enacted what Petitioner refers to as "Special Provision 17.27," which requires the Parole Commission to make a "good faith effort" to enroll 20 percent of eligible inmates in a Mutual Agreement Parole Program (MAPP). In that program, selected parole-eligible prisoners, North Carolina's Division of Prisons, and the Parole Commission enter into a signed but non-binding agreement, pursuant to which the prisoner agrees to work to meet certain goals and the Parole Commission promises to parole the prisoner upon satisfaction of the goals. (Docket Entry 11, Ex. 2.) By letter dated November 14, 2005, Petitioner received notice of his eligibility for this program and that, after a review of his case, the Parole Commission would inform him of its decision regarding his entry into the MAPP. (Docket Entry 1, Ex. B.) On December 21, 2005, the Parole Commission notified Petitioner via letter that he should expect a decision within about 90 days. (Id. Ex. C.)

So far as the record reflects, Petitioner received no further information regarding the MAPP until May 8, 2006, when the Parole Commission informed him in a letter that it had reviewed his case and had determined that "the MAPP should be suspended and parole denied." (Id. Ex. D.) As reasons for its decision, the Parole Commission stated that "continued correctional programming in the institution [would] substantially enhance [Petitioner's] capacity to lead a law abiding life if released at a later date" and that his release "would unduly depreciate the seriousness of [his] crime or promote disrespect for the law." (Id.) Petitioner later wrote the Parole Commission seeking clarification as to the wording of

the letter regarding the MAPP "be[ing] suspended," and asking what programming the Parole Commission wished for him to have in order to secure parole. (<u>Id.</u> Ex. H.) The record does not reflect that he received a response.

Petitioner was later denied parole in letters dated November 22, 2006, and November 28, 2007. (<u>Id.</u> Exs. E, F.) These letters gave the same two reasons for denial as the May 8, 2006 letter. (<u>Id.</u>) Petitioner wrote at least three other letters asking the Parole Commission about the MAPP program and/or how he could satisfy the criteria for parole. (<u>Id.</u> Exs. I, J, K.) He alleges that he received no response to any of the letters.

## II. Claims

Petitioner raises three claims based on the foregoing facts. First, he asserts that North Carolina's statutes, in conjunction with the MAPP provision, create a liberty interest in parole protected by the Due Process Clause of the Fourteenth Amendment of the United States Constitution. He claims that the denial of his parole and, perhaps, his suspension from the MAPP deprived him of this liberty interest without due process. (<u>Id.</u> Attach. A, Ground One.) Second, Petitioner asserts that the Parole Commission's decisions to suspend him from the MAPP and to deny him parole "do not comport with the minimum requirements of due process, are vindictively and arbitrarily applied, are not supported by some evidence and give no specific information" to support the decisions or to guide Petitioner in qualifying for parole. (<u>Id.</u> Ground Two.)

In addition to his due process claims, Petitioner also raises a claim under the Equal Protection Clause of the Fourteenth Amendment. He argues that the Parole Commission has acted "in an uneven, arbitrary and capricious manner causing similarly or worse situated inmates to be paroled sooner than [P]etitioner." (Id. Ground Three.) As support for this claim, he refers to the case of fellow murderer John Hayes. According to the Petition and accompanying exhibits, Hayes was tried capitally for the murder of his wife in 1996, but was convicted of second-degree murder and was given a Class C life sentence with parole eligibility in ten years. Hayes was paroled on January 19, 2007, after serving just more than ten years in prison. Petitioner alleges "on information and belief" that Hayes only participated in one rehabilitative program, while Petitioner "has taken nearly every self-help rehabilitative program NCDOC has to offer." (Id. ¶¶ 7, 8.) Petitioner contends that his continued incarceration, when compared with Hayes's release on parole, establishes an equal protection violation. As a remedy for the alleged violations set out in the Petition, Petitioner asks that the Court order the Parole Commission to release him within 30 days of this Court's granting of habeas relief.

### III. Exhaustion/Procedural History

As required by § 2254(b)(1)(A), Petitioner did raise his claims in the state courts and exhausted his remedies there. He initially brought the claims in a petition for a writ of habeas corpus filed in the Stanly County Superior Court. (Docket Entry 1,

-4-

Ex. S.)  When that petition was denied, he then sought a writ of habeas corpus from the North Carolina Court of Appeals.  (<u>Id.</u> Exs. W, T.)  After denial of that writ, Petitioner unsuccessfully petitioned the North Carolina Supreme Court for a writ of habeas corpus.  (<u>Id.</u> Exs. X, V, Y.)  He then filed the current Petition in this Court.

Respondent thereafter filed a Motion for Summary Judgment seeking to have the claims in the Petition denied.  (Docket Entry 10.)  Petitioner responded with several motions: 1) a Motion to Hold Respondents [sic] Summary Judgment Motion in Abeyance and to Obtain Leave to Conduct Discovery (Docket Entry 13); 2) Petitioner's First Request for Statistical Information and Production of Documents (Docket Entry 16); 3) a Motion to Obtain an Evidentiary Hearing (Docket Entry 19); and 4) a Motion to Obtain Ruling on Standard Applied to Petition (Docket Entry 21). Petitioner also filed a response to the motion for summary judgment, along with a supporting memorandum in which he argued against only the portion of Respondent's Summary Judgment Motion which raised a statute of limitations defense.  He sought to hold any argument on the merits of his claims in abeyance pending discovery because he was "unable to put forth <u>any</u> opposition to the summary judgment motion without discovery."  (Docket Entry 13 at 2 (emphasis in original).)

Petitioner's case was next delayed due to two appeals.  First, Petitioner filed an interlocutory appeal concerning the denial of a motion to amend the Petition that he made prior to Respondent

-5-

moving for summary judgment. (Docket Entry 24.) That appeal
delayed matters until March of 2009, when the United States Court
of Appeals for the Fourth Circuit dismissed it. (Docket Entries
34, 35, 36.) At that point, Respondent renewed his summary
judgment motion and Petitioner renewed his motion to hold that
motion in abeyance pending discovery. (Docket Entries 32, 38.)
Petitioner also renewed his motions seeking to obtain a ruling on
the standard of review applicable to the Petition and an
evidentiary hearing. (Docket Entries 42, 43.)

The additional delay resulted from an appeal in a separate
case filed by Petitioner in this Court under 42 U.S.C. § 1983, Cook
v. Director of Prisons Boyd Bennett, et al., 1:07CV31 (M.D.N.C.),
which raised different, although somewhat related, issues connected
to Petitioner's parole eligibility. Following the Court's
dismissal of most of his claims in that case, Petitioner
voluntarily dismissed his remaining claim and sought to appeal the
Court's dismissal of the other claims. (1:07CV31, Docket Entries
55, 72, 81.) Because issues in the appeal in 1:07CV31 might have
impacted the claims in the Petition in the instant case, the Court
stayed this case pending resolution of Petitioner's appeal in
1:07CV31. Eventually, Petitioner lost his appeal in that case and
the stay in the present case was lifted.

### IV. Petitioner's Motions

Before discussing Respondent's Renewed Motion for Summary
Judgment, the Court will first briefly touch on Petitioner's
pending motions. As just stated, Petitioner seeks to hold the

summary judgment decision in abeyance while he conducts discovery, to have the Court make a determination as to the standard of review applicable to the Petition, and to have an evidentiary hearing. Although decisions on all of these motions impact the timing and nature of a decision on Respondent's Renewed Motion for Summary Judgment, they are also all inextricably intertwined with the merits of Petitioner's case. Therefore, the Court will proceed to the summary judgment discussion and will address issues related to Petitioner's motions as they arise.

## V. Respondent's Renewed Motion for Summary Judgment

### A. Statute of Limitations

Respondent requests partial dismissal on the ground that the Petition was filed[1] outside of the one-year limitation period set forth in 28 U.S.C. § 2244(d)(1). As the Fourth Circuit has explained:

---

[1] "In [Houston v. Lack, 487 U.S. 266 (1988)], the Supreme Court held that a pro se prisoner's notice of appeal is filed on the date that it is submitted to prison officials for forwarding to the district court, rather than on the date that it is received by the clerk." Morales-Rivera v. United States, 184 F.3d 109, 110 (1st Cir. 1999). At least eight circuits "have applied th[is] prisoner mailbox rule to [establish the 'filing' date of] motions under 28 U.S.C. § 2254 or § 2255." Id. at 110-11 & n.3. In two published opinions issued since the foregoing consensus emerged, however, the Fourth Circuit has declined to decide whether the prison mailbox rule applies in this context. See Allen v. Mitchell, 276 F.3d 183, 184 n.1 (4th Cir. 2001) ("Allen's petition was dated March 9, 2000, and it should arguably be treated as having been filed on that date. Cf. United States v. Torres, 211 F.3d 836, 837 n. 3 (4th Cir. 2000) (declining to decide whether prison mailbox rule applies to filing of federal collateral review applications in district court). We take no position on that question here."); but see Ostrander v. Angelone, 43 Fed. Appx. 684, 684-85 (4th Cir. 2002) (implying that Houston's prison mailbox rule governed determination of § 2254 petition's filing date). Because the difference between the dates on which Petitioner signed his instant Petition (i.e., the earliest date on which he could have provided it to prison officials for mailing) and the date on which the Clerk received the Petition would have no effect on the timeliness of the filing, the Court declines to consider this issue further.

Under § 2244(d)(1)(A)-(D), the one-year limitation period [for § 2254 petitions] begins to run from the latest of several potential starting dates:

(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

Green v. Johnson, 515 F.3d 290, 303-04 (4th Cir. 2008). Here, Petitioner does not challenge his original conviction, but the denials of MAPP participation and parole which first occurred years later. Therefore, the limitations period began to run at the time the factual predicates for Petitioner's claims existed and could have been discovered, i.e., at the times that he was "suspended" from the MAPP and denied parole. 28 U.S.C. 2244(d)(1)(D).

Respondent notes that Petitioner bases his claims on the denial of his parole in December of 2004, his MAPP suspension and denial of parole in May of 2006, the denial of his parole in November of 2006, and the denial of his parole in November of 2007. However, Petitioner did not begin to litigate his claims in the state courts until he filed his habeas petition in the Stanly County Superior Court on February 14, 2008, more than a year after

all of the dates on which the supporting facts occurred, except for the denial of Petitioner's parole in November of 2007. Therefore, Respondent argues that Petitioner's claims are time-barred to the extent that they involve the first three denials of parole and/or his MAPP suspension.

Petitioner addresses this point in his Response to the Motion for Summary Judgment. He does not deny that most of the facts in the Petition occurred more than a year prior to his first filing in the state courts. However, he opposes Respondent's time-bar argument by pointing out that none of the case law cited by Respondent "supports or mentions a partial statute of limitations applying to parole denial challenges." (Docket Entry 18 at 4.)

Although Petitioner's characterization of the case law cited by Respondent is accurate, other case law does support Respondent's time-bar argument, including most significantly <u>McAleese v. Brennan</u>, 483 F.3d 206 (3d Cir. 2007). In <u>McAleese</u>, the petitioner was first denied parole in 1995. He filed a habeas petition challenging the denial in 1998, more than two and one-half years later. The petition was eventually dismissed as untimely filed. During the pendency of the case, the petitioner was also denied parole in 2000 and 2001. The petitioner did not raise new claims as to those denials, but did contend that they constituted "a 'continuing violation' of his rights" which rendered his 1998 challenge to the 1995 denial timely. The trial court rejected this argument, as did the United States Court of Appeals for the Third Circuit.

The Third Circuit concluded that, even if a "continuing violation" theory applied to the limitation period, it would not help the petitioner, because a litigant relying on a continuing violation theory must accomplish two tasks: "(1) 'he must demonstrate that at least one act occurred within the filing period[,]' and (2) he must establish that the conduct is 'more than the occurrence of isolated or sporadic acts,' i.e., the conduct must be 'a persistent, on-going pattern.'" Id. at 218 (quoting West v. Philadelphia Elec. Co., 45 F.3d 744, 754 (3d Cir. 1995)). The court held that the petitioner satisfied neither criteria. As to the first requirement, neither the 2000 nor 2001 denial occurred before the time expired for the petitioner to file as to the 1995 denial. Also, the petitioner failed to raise any claim as to the later denials. As to the second requirement, the Third Circuit concluded that the three denials did not represent part of an ongoing pattern. Id. at 218-19.

In the present case, Petitioner does base his claims on one act, the November 2007 denial of parole, that occurred within the filing period. This fact distinguishes Petitioner's case from McAleese as to the first factor. However, Petitioner still cannot challenge the earlier parole denials and "suspension" from the MAPP because, just as in McAleese, these decisions constitute discrete acts, not parts of a pattern. Therefore, the statute of limitations bars any claim based on the earlier decisions.

Other courts have reached the same conclusion in similar situations. Wolfel v. Timmerman-Cooper, No. 2:07-cv-1079, 2009 WL

330294, at *2 (S.D. Ohio Feb. 6, 2009) (unpublished) (rejecting Petitioner's argument that "continuing violation" theory allowed him to challenge parole denials otherwise outside limitations period); Conger v. Quarterman, No. 4:07-CV-520-Y, 2008 WL 4062067, at * 2 (N.D. Tex. Aug. 25, 2008) (unpublished) ("The factual predicate of [the petitioner's] claims involving the Board's denials of parole was discoverable on . . . the dates parole was denied. Accordingly the one-year statute of limitations [as to each denial] began on [the dates of each denial].") Walls v. Attorney General of Pa., Civil Action No. 06-1598, 2007 WL 4190790, at *2 (W.D. Pa. Nov. 26, 2007) (unpublished) (applying McAleese and allowing parole claim based only on recent denial that occurred within limitation period and not prior denials); Weathersby v. Director, TDCJ-CID, Civil Action No. 6:05cv460, 2006 WL 1149193, at *3 (E.D. Tex. May 1, 2006) (unpublished) (holding that statute of limitations begins to run as to each denial of parole on date that denial occurred).

This Court agrees with those courts and McAleese. For that reason, Petitioner has filed a timely challenge only to the denial of his parole on November 14, 2007. The claims based on the prior parole denials and Petitioner's "suspension" from the MAPP should be dismissed as untimely filed.

## B. Applicable Legal Standards

Petitioner has made a motion seeking to have the Court determine the standard of review that applies to his claims.

Respondent requests review under the standard set out in 28 U.S.C. § 2254(d), whereas Petitioner seeks de novo review.

Where the state courts adjudicated a petitioner's claims on their merits, this Court must apply § 2254(d)'s highly deferential standard of review to such claims.  That statute precludes habeas relief in cases where a state court has considered a claim on its merits unless the decision conflicted with or involved an unreasonable application of clearly established federal law as set out by the United States Supreme Court or unless the state court decision arose from an unreasonable determination of the facts.  A state court decision is "contrary to" Supreme Court precedent if it either arrives at "a conclusion opposite to that reached by [the Supreme] Court on a question of law" or "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite" to that of the Supreme Court.  <u>Williams v. Taylor</u>, 529 U.S. 362, 406 (2000).  A state court decision "involves an unreasonable application" of Supreme Court law "if the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." <u>Id.</u> at 407.  "Unreasonable" means more than "incorrect" or "erroneous" and a federal court must judge the reasonableness of the state court's decision from an objective, rather than subjective, standpoint.  <u>Id.</u> at 409-11.  Federal courts presume the correctness of state court findings of fact absent rebuttal by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

Here, Petitioner did raise his three claims in the state courts through a petition for habeas corpus. Those courts adjudicated and denied his claims. Nonetheless, Petitioner argues that § 2254(d)'s standard of review does not apply to his due process claim because the state court that first considered his state habeas petition failed to understand his claims for relief. According to Petitioner, the state court thought he was using the claims to challenge his original conviction, rather than the denials of parole, and that such an "incorrect" adjudication deserves no deference. (Docket Entry 22 at 2.) Petitioner also asserts that the state court did not consider his equal protection claim at all. (<u>Id.</u> at 3.) He acknowledges that the state court recognized that he had raised three claims because it said as much in its denial decision; however, Petitioner maintains that recognition differs from adjudication and that the state court did not adjudicate the claims because it failed to discuss them sufficiently. (<u>Id.</u> at 3-5.)

The Court rejects Petitioner's attempt to lower the standard of review. Although the state court did discuss the fact that Petitioner could not attack his original conviction in the court where he filed his habeas petition, it also quite clearly understood that he challenged the denial of his parole and it discussed that challenge. (Docket Entry 1, Ex. W.) In addition, although the state court did not evaluate the equal protection claim separately, it took note of all three claims and denied relief as to the entire petition. (<u>Id.</u>)

-13-

The state court thus "adjudicated" all of the claims, albeit in a summary manner that lacked discussion of federal law concerning due process or equal protection. No such requirement, however, exists. <u>Early v. Packer</u>, 537 U.S. 3, 8 (2002) (ruling that state court need not cite relevant Supreme Court cases for decision to merit deference); <u>Bell v. Jarvis</u>, 236 F.3d 149, 158 (4th Cir. 2000) ("In this case, the North Carolina state court did not articulate the rationale underlying its rejection of [the petitioner's] Sixth Amendment claim. However, we may not presume that the summary order is indicative of a cursory or haphazard review of the petitioner's claims. Rather, the state court decision is no less an adjudication of the merits of the claim and must be reviewed under the deferential provisions of § 2254(d)(1)." (internal brackets and quotation marks omitted)). The state court's denial constitutes an adjudication entitled to deference under § 2254(d); therefore, the Court will apply said statute's limited standard of review and will deny Petitioner's request for application of a different standard.[2]

## C. Due Process Claim

Petitioner contends that the denial of his parole in November of 2007 violated his right to due process. A question exists as to whether Petitioner has any right to due process in his parole proceedings. The Fourth Circuit has explained that:

> "There is no constitutional or inherent right of a
> convicted person to be conditionally released before the

---

[2] The Court also notes that, even if a de novo standard applied, the outcome of the case would not change in light of the reasoning set out below.

expiration of a valid sentence." <u>Greenholtz v. Nebraska</u>
<u>Penal Inmates</u>, 442 U.S. 1, 7, 99 S.Ct. 2100, 2104, 60
L.Ed.2d 668 (1979). This is because "given a valid
conviction, the criminal defendant has been
constitutionally deprived of his liberty." <u>Id.</u> at 7, 99
S.Ct. at 2104, <u>quoting</u> <u>Meachum v. Fano</u>, 427 U.S. 215,
224, 96 S.Ct. 2532, 2538, 49 L.Ed.2d 451 (1976). The
absence of a constitutional right to parole means that a
state has no duty to establish a system of parole, <u>id.</u>,
and if it chooses to do so, federal courts should allow
a state's parole authorities "a wide range for
experimentation and the exercise of discretion." <u>Franklin</u>
<u>v. Shields</u>, 569 F.2d 784, 800 (4th Cir.1977) (en banc),
<u>cert.</u> <u>denied</u>, 435 U.S. 1003, 98 S.Ct. 1659, 56 L.Ed.2d 92
(1978). "Moreover, to insure that the state-created
parole system serves the public-interest purposes of
rehabilitation and deterrence, the state may be specific
or general in defining the conditions for release and the
factors that should be considered by the parole
authority." <u>Greenholtz</u>, 442 U.S. at 7-8, 99 S.Ct. at
2104.

<u>Vann v. Angelone</u>, 73 F.3d 519, 521 (4th Cir. 1996).

A liberty interest in parole can arise from the terms of state
statutes. <u>Greenholtz</u>, 442 U.S. at 12. However, even in such
circumstances, the Fourth Circuit has determined that due process
requires only that authorities "'furnish to the prisoner a
statement of [their] reasons for denial of parole.'" <u>Vann</u>, 73 F.3d
at 522 (quoting <u>Franklin v. Shields</u>, 569 F.2d 784, 801 (4th Cir.
1977)).

Respondent argues that North Carolina statutes do not create
a liberty interest in parole. Although this argument has apparent
merit (<u>see</u> Docket Entry 11 at 8-9 (citing and discussing current
North Carolina statutes that grant discretion to Parole Commission
and North Carolina state appellate court decision finding no
liberty interest in parole)), the Court need not decide the matter
because, even if a liberty interest in parole existed in North

Carolina, Petitioner received all of the due process required under <u>Vann</u>. The Parole Commission notified him of the denial and provided him with the reasons for the decision. Petitioner disagrees with those reasons and seeks to challenge them. However, such action falls outside the scope of any due process protection. As the Court explained in a recommendation in his earlier § 1983 case, the Parole Board's decision satisfies due process requirements. <u>Cook v. Bennett</u>, No. 1:07CV31, 2008 WL 4981327 (M.D.N.C. Nov 19, 2008)(unpublished), <u>subsequently aff'd</u>, 364 Fed. Appx. 813 (4th Cir. 2010). His due process claim in the present case should be denied for the same reasons as his due process claim in his § 1983 case.[3]

As a final matter, Petitioner seeks discovery as to his due process claim. Rule 6 of the Rules Governing Section 2254 and 2255 Proceedings authorizes discovery in post-conviction proceedings but, "[u]nlike other civil litigants, a § 2254 habeas petitioner 'is not entitled to discovery as a matter of ordinary course.'" <u>Stephens v. Branker</u>, 570 F.3d 198, 213 (4th Cir. 2009)(quoting <u>Bracy v. Gramley</u>, 520 U.S. 899, 904 (1997)), <u>cert.</u> <u>denied</u>, 130 S.Ct. 1073 (2010). Instead, before beginning discovery, a petitioner must obtain leave of court by showing good cause. <u>Bracy</u>, 520 U.S. at 904, 908-09; <u>Maynard v. Dixon</u>, 943 F.2d 407, 412 (4th Cir. 1991). "A showing of good cause must include specific

---

[3] Differences between Petitioner's due process claim in the § 1983 case and the current case may mean that principles of <u>res</u> <u>judicata</u> do not bar his due process claim under § 2254. Nevertheless, the same basic reasoning applies and defeats the claim.

allegations suggesting that the petitioner will be able to demonstrate that he is entitled to habeas corpus relief." Stephens, 570 F.3d at 204.

Here, all of the discovery that Petitioner requests regarding his due process claim appears aimed at litigating the merits of the Parole Commission's decision-making. For example, Petitioner seeks documents related to his parole hearings, statutes, rules, and other materials used to make parole assessments, as well as Petitioner's mental health and prison educational records. (Docket Entry 16.) As previously explained, Petitioner cannot litigate the merits of the parole decision. More importantly, he has, as a matter of law, received all required due process for the denial of his parole. As a result, none of his requested discovery could affect the outcome of the due process claim in this proceeding. Petitioner cannot show good cause for discovery and his motion for discovery will be denied as to the due process claim.

### D. Equal Protection

Petitioner's remaining claim asserts a denial of equal protection based on the allegation that similarly situated inmates received parole when he did not. In a context outside of a prison setting, the Fourth Circuit has stated:

> The Equal Protection Clause to the Fourteenth Amendment provides that "[n]o State shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The Clause does not proscribe most forms of unequal treatment, because "[l]awmaking by its nature requires that legislatures classify, and classifications by their nature advantage some and disadvantage others." Helton v. Hunt, 330 F.3d 242, 245 (4th Cir. 2003). Rather, the guarantee of equal

protection was intended merely "as a restriction on state legislative action inconsistent with elemental constitutional premises." <u>Plyler v. Doe</u>, 457 U.S. 202, 216, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982). Thus, the Constitution only forbids arbitrary differentiations among groups of persons who are similar in all aspects relevant to attaining the legitimate objectives of legislation. <u>F.S. Royster Guano Co. v. Virginia</u>, 253 U.S. 412, 415, 40 S.Ct. 560, 64 L.Ed. 989 (1920).

Some classifications, like those based on race and gender, are deemed inherently "suspect" because they are rarely relevant to attaining a permissible legislative goal, and thus are subjected to varying degrees of heightened scrutiny by the courts. <u>Plyler</u>, 457 U.S. at 216 & n. 14, 102 S.Ct. 2382. Other classifications will likewise be treated as suspect where they have the purpose or effect of burdening a group in the exercise of a fundamental right protected by the Constitution. <u>Id.</u> at 217 & n. 15, 102 S.Ct. 2382. But the vast majority of governmental action – especially in matters of local economics and social welfare, where state governments exercise a plenary police power – enjoys a "<u>strong presumption</u> of validity" and must be sustained against a constitutional challenge "so long as it bears a rational relation to some legitimate end." <u>Helton</u>, 330 F.3d at 246 (emphasis added).

<u>Van Der Linde Housing, Inc. v. Rivanna Solid Waste Authority</u>, 507 F.3d 290, 293 (4th Cir. 2007).

In the prison context, the Fourth Circuit has held that:

When we conduct an equal protection review of the individualized decision of a state official made within his lawful authority, we apply the same analysis as is commonly used in the context of allegedly unlawful legislative decisions. The Fourteenth Amendment, in pertinent part, provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The essence of the guarantee is that persons in the same circumstances will be treated similarly by the law, and a corollary follows that the Constitution does not require "things which are different in fact or opinion to be treated in law as though they were the same." <u>Tigner v. Texas</u>, 310 U.S. 141, 147, 60 S.Ct. 879, 882, 84 L.Ed. 1124 (1940). The state may apply the law differently based on distinctive factual circumstances if the distinction is rationally related to a legitimate governmental purpose.

> When, however, the distinction (or other discrimination) is based on a "suspect classification" or effects the denial of a fundamental right, the constitutional scrutiny sharpens its focus to determine whether the classification is narrowly tailored to serve a compelling governmental interest. See Plyler v. Doe, 457 U.S. 202, 216-17, 102 S.Ct. 2382, 2394-95, 72 L.Ed.2d 786 (1982). A class is suspect when it is defined from a deep-seated prejudice rather than the rational pursuit of some legislative objective, and a fundamental right is one that is otherwise guaranteed in the Constitution. Plyler, 457 U.S. at 216-17 nn. 14 & 15, 102 S.Ct. at 2394-95 nn. 14 & 15. In the end we must decide whether state action discriminated against the individual and if so whether it was otherwise legally justified.

O'Bar v. Pinion, 953 F.2d 74, 81-82 (4th Cir. 1991).

Here, because Petitioner has alleged neither discrimination based on a suspect classification nor a violation of a fundamental right otherwise guaranteed by the Constitution, any analysis of the decision to deny him parole would necessarily implicate only the "rational basis" standard. Moreover, before even that analysis, the Court would have to conclude that Petitioner had shown differential treatment from similarly situated inmates. He has not.

Petitioner points to the case of former fellow inmate John Hayes, as to whom Petitioner has presented a mix of news articles, prison records, and allegations based on "information and belief." Ignoring potential evidentiary issues with Petitioner's submission, his information tends to show that Hayes was a 60-year-old white businessman and cancer survivor involved in an unhappy and volatile marriage with Fran Hayes. During an altercation in 1994 in the couple's garage, John beat Fran to death with a baseball bat. He attempted to dissolve her body with acid and then set it on fire.

In the end, he waited two days before calling police himself to report the killing. Hayes was tried capitally, but convicted of second-degree murder after a jury trial. He received the same sentence as Petitioner, life imprisonment with parole eligibility in ten years. (Docket Entry 1, Exs. N-P.) Hayes went to prison on November 26, 1996, at age 62. He was later paroled from a "Minimum 3" custody classification at the Charlotte Correctional Center on January 19, 2007, after serving just more than ten years in prison and having received no disciplinary infractions. (Id. Ex. R.) Petitioner states on "information and belief" that Hayes only participated in one rehabilitative program while incarcerated. (Docket Entry 1, Attach A, Ground Three, ¶ 7.)

Petitioner does not present the facts associated with the murder he committed, but the North Carolina Supreme Court discussed the crime in connection with his co-defendant's appeal:

> The State's evidence tended to show inter alia that in the early morning hours of 29 June 1992, defendant's first cousin, Chris Cook [i.e., Petitioner], entered defendant's home, where he shot and killed defendant's wife, Melissa Cooper Mickey. Defendant Terry Mickey had hired and conspired with Cook to perform the killing for $10,000. Cook ultimately confessed to the murder and implicated defendant.
>
> Defendant and Melissa had been separated in 1985 or 1986 and later reconciled. Defendant had lived with another woman during their separation. Defendant later met Cindi Rinaldi, a co-worker at the post office, and began a relationship with her. Defendant told Rinaldi that he was planning to divorce his wife but that an attorney had advised that he wait until his bills were paid.
>
> Defendant solicited Joe Ray to murder defendant's wife about eight months before she was killed. Ray refused to participate. Defendant asked Ray if his nephew

would kill defendant's wife, and Ray said no. Defendant then asked Ray to get a gun for him, which Ray did.

Defendant's cousin, Chris Cook, was in the Marine Corps stationed at Virginia Beach when defendant phoned to ask if he knew of a way to raise $50,000. At one point, Cook and defendant planned to rob a drug dealer to raise money, but they did not go through with the plan.

In 1990 or 1991, Cook learned that defendant was making purchases and cash advances using credit cards he had stolen from the mail while he was a postal employee. Defendant sometimes gave Cook cash advances drawn on the stolen credit cards. Defendant also gave Cook a video cassette recorder and, in June 1991, an engagement ring for Cook's fiancée, paying for the purchases of those items with the stolen credit cards.

Cook was discharged from the Marine Corps on 3 September 1991. He broke up with his fiancée in January or February 1992 and pawned the ring, which defendant later redeemed from the pawn shop. In June 1992, defendant offered Cook $5,000 to kill defendant's wife Melissa. Cook refused the offer. Defendant repeated his offer to Cook on 14 June 1992. Defendant reminded Cook of all the cash and gifts he had given him. Cook continued to refuse the offer and tried to avoid defendant. Defendant went to Cook's house and promised to pay $5,000 before the killing and $5,000 after defendant received $50,000 from an insurance policy defendant had taken out on Melissa several months earlier. Cook finally agreed to defendant's scheme to kill Melissa.

Defendant and Cook met at defendant's house on Sunday, 28 June 1992, to plan the murder. Defendant's children were at the beach with Melissa's parents, and he stated that he wanted the killing done that night or the next morning. Defendant met Cook at about 2:45 a.m. and took him to defendant's home. Defendant gave Cook a ski mask, surgical gloves, and a .38-caliber revolver loaded with six rounds of ammunition. Defendant told Cook to wait thirty to forty-five minutes before killing Melissa so defendant could establish an alibi.

Cook entered the house through a door left unlocked by defendant by prior arrangement and found Melissa lying in bed. He shot Melissa in the right jaw. She writhed her way to the far side of the bed. Cook went around the bed, where, firing through a pillow to muffle the sound, he shot her in the back of the head and through the back. He ran from the house, removed the mask and gloves, and hid

the gun and mask under a pile of rocks. Cook then called his roommate for a ride home from a convenience store, where he was seen by witnesses. Cook told his roommate that he had been at a construction site early that morning. He claimed that because they had run out of supplies, he was jogging home when he fell and hurt himself.

When Cook arrived at his home, he washed his clothes and contacted his employer, Tim Edwards, to establish an alibi. He wanted Edwards to say that he had been working at one of Edwards' job sites early that morning. Thinking that Cook had gotten into some minor trouble, Edwards agreed to the scheme. Edwards later disavowed Cook's alibi when Edwards was questioned by investigators and realized that Cook wanted an alibi for the morning of the murder.

Melissa Mickey's friends and co-workers at L & M Floor Covering had become concerned that she had not come to work by the time defendant phoned and asked for her at 10:00 to 10:30 a.m. Annette Owens went to defendant and Melissa's home to look for Melissa. She found Melissa's car in the garage but did not find Melissa. She discussed her concerns with her co-workers and Garland Lawson, the store owner. Lawson contacted the Lenoir County Sheriff's Department to have a deputy check the house. Lawson met Deputy Greer at the house, and they went through it together. They found Melissa's body in a kneeling position on the floor at the side of the bed, with one elbow lying on the mattress. Lawson and Deputy Greer left the house, called for assistance, and waited outside.

State v. Mickey, 347 N.C. 508, 510-13, 495 S.E.2d 669, 671-72 (2008). Petitioner was convicted in 1995 and is still serving his sentence. North Carolina Department of Correction records describe Petitioner as a 43-year-old white male currently incarcerated in medium security custody and having had one disciplinary infraction. See http://www.doc.state.nc.us ("public offender search" for "Christopher E. Cook" with "Offender ID" of "0486661" last completed March 25, 2011).

-22-

Petitioner and Hayes thus have some similarities. They are both white males convicted of second-degree murder around the same time. Both received life sentences with parole eligibility in ten years and both managed to keep clean or nearly clean disciplinary records while incarcerated. Important distinctions between Petitioner and Hayes, however, also exist.

First, Hayes was paroled at age 72, or nearly 30 years beyond Petitioner's current age.[4] Also, the circumstances of Hayes's and Petitioner's crimes differed greatly. Most notably, unlike Hayes, Petitioner committed a murder-for-hire. See generally Perdue v. Commonwealth, 916 S.W.2d 148, 165 (Ky. 1995) (describing "murder for hire" as perhaps "the most heinous of all crimes"); Brockman v. State, 341 A.2d 849, 850-51 (Md. Ct. Spec. App. 1975) ("[I]t is clear that [the defendant] committed one of the most heinous of crimes against his fellow man – murder for hire."), aff'd, 357 A.2d 376 (Md. 1976).

Finally, Petitioner is housed in a medium security facility, while Hayes's records show that he was paroled from a minimum security facility. In Petitioner's prior case under § 1983, he challenged his custody level, contending that prison officials

_____

[4] What part age may have played in the granting of parole to Hayes, but not Petitioner, remains unknown. Because age does not qualify as a suspect classification, its consideration would not require strict scrutiny in an equal protection analysis. Arritt v. Grisell, 567 F.2d 1267, 1272 (4th Cir. 1977). Moreover, a rational basis exists to differentiate parole applicants based on age. See generally United States v. Nellum, No. 2:04-CR-30-PS, 2005 WL 300073, at *3 (N.D. Ind. Feb. 3, 2005) (unpublished) ("The likelihood of recidivism by a 65 year old is very low. In fact, according to a United States Sentencing Commission Report released in May, 2004, 'Recidivism rates decline consistently as age increases. Generally, the younger the offender, the more likely the offender recidivates.'").

should have promoted him to minimum security. Petitioner sought
the promotion because of the impact that it would have on his
chances of parole. As was noted in that case, Petitioner alleged
that "North Carolina parole guidelines strongly discourage, but do
not forbid, paroling a prisoner who is housed in a medium security
facility. . . . Therefore, in order to have a meaningful chance to
be paroled, Plaintiff [would] have to first spend time incarcerated
in a minimum security facility." Cook v. Bennett, 2008 WL 4981327,
at * 1. The difference in custody levels between Petitioner and
Hayes represents a significant dissimilarity which, according to
Petitioner's prior suit, would affect parole determinations.

Overall, Petitioner and Hayes share some facial similarities,
but differ materially in age, the circumstances of their crimes,
and their custody level. These differences mark the pair as
insufficiently "similarly situated" for equal protection purposes.[5]
The state courts' denial of Petitioner's equal protection claim
thus was not "contrary to, or an unreasonable application of" any
established Supreme Court precedent. That decision must stand and
Petitioner's equal protection claim should be denied.

As with his due process claim, Petitioner seeks discovery
regarding his equal protection claim. He asks that the State
produce the statistical information regarding the number of inmates

---

[5] Indeed, "in light of the myriad of factors involved in a parole decision,
it is difficult to believe that any two prisoners could ever be considered
similarly situated for the purpose of judicial review of an equal protection
claim." Reffitt v. Nixon, 917 F. Supp. 409, 414 (E.D. Va. 1996) (internal
brackets and quotation marks omitted), aff'd, No. 96-6808, 121 F.3d 699 (table
decision without opinion), 1997 WL 428600 (4th Cir. July 31, 1997) (unpublished).

who received life sentences similar to his and their parole status. He also requests various documents related to parole statutes and rules, his parole hearings, Hayes's completion of education and rehabilitation courses, and his own such course work. (Docket Entry 16.) As stated above in relation to Petitioner's due process claim, Petitioner has no right to discovery unless he makes a showing of good cause which includes specific allegations suggesting an entitlement to habeas corpus relief. Stephens, 570 F.3d at 204. He again has made no such showing.

First, Petitioner's request for statistical information represents a classic fishing expedition, which Habeas Rule 6 does not permit. See Murphy v. Johnson, 205 F.3d 809, 814 (5th Cir. 2000) ("Simply put, [Habeas] Rule 6 does not authorize fishing expeditions."). He hopes to find data in the State's prison records from which he could build a basis for his equal protection claim. If the Court allowed such discovery, any prisoner denied parole could file an equal protection habeas claim and then use discovery to search for records that would support his or her claim. Such an approach would eviscerate Habeas Rule 6's good cause standard.

Second, Petitioner's discovery requests regarding records related to his prior parole hearings appear aimed at litigating the merits of the parole decision, rather than any issue relevant to the Equal Protection Clause analysis. For reasons previously discussed, he thus has no right to such discovery. Nor will the Court permit discovery regarding Petitioner's and/or Hayes's

rehabilitative efforts in prison.  Although this information could
have relevance to an equal protection claim, it would not affect
Petitioner's claim in this case.  Even if the requested evidence
established the differences forecast by Petitioner, the other,
previously discussed distinctions between Petitioner and Hayes
still would preclude a finding of similar-situatedness (and thus of
an equal protection violation).  "[B]ecause the requested documents
do not change the outcome herein, and because [Petitioner] has not
explained how the documents will otherwise assist his case, this
Court concludes that he has not shown 'good cause' for discovery
under [Habeas] Rule 6(a) . . . ."  Bernard v. United States, No.
Cr-06-092-025, 2010 WL 1626461, at *8 n.16 (D.R.I. Apr. 20, 2010)
(unpublished).

Under these circumstances, the Court will deny discovery on
Petitioner's equal protection claim and will not defer
consideration of Respondent's summary judgment motion.  Further,
because the Petition should be denied for the reasons discussed, no
evidentiary hearing is required in the matter.

**IT IS THEREFORE ORDERED** that Petitioner's Motion to Hold the
Renewed Summary Judgment in Abeyance (Docket Entry 38), Renewed
Motion to Obtain Ruling on the Standard Applied to Petition (Docket
Entry 42), and Renewed Motion to Obtain an Evidentiary Hearing
(Docket Entry 43) are **DENIED.**

**IT IS RECOMMENDED** that Respondent's Renewed Motion for Summary
Judgment (Docket Entry 32) be granted, that the Habeas Petition

(Docket Entry 1) be denied, and that Judgment be entered dismissing this action.

                            /s/ L. Patrick Auld
                            **L. Patrick Auld**
                   **United States Magistrate Judge**

March 28, 2011